UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
LAUREN TIBORSKY,

                                Plaintiff,

        —against—

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                                Defendant,
-------------------------------------------------------------x

**<u>MEMORANDUM AND ORDER</u>**

07-CV-2770 (SLT)

**TOWNES, United States District Judge:**

Plaintiff Lauren Tiborsky brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3),

seeking review of a final decision of Defendant Michael J. Astrue, Commissioner of Social

Security ("the Commissioner"), which held that Plaintiff was not disabled under sections 216(i)

and 223(d) of the Social Security Act, as amended ("the Act") and was, therefore, ineligible for

Disability Insurance Benefits ("DIB"). Plaintiff and the Commissioner now cross-move for

judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). For the reasons set forth below, the

Commissioner's motion is denied and plaintiff's cross-motion is granted to the extent of

remanding this action to the Commissioner for further proceedings in accordance this opinion.

### *BACKGROUND*

#### *Plaintiff's Education and Work History*

Plaintiff was born on May 27, 1963 (646).[1]  She attended Flushing High School in

Queens, New York, but completed only the tenth grade (651). Thereafter, Plaintiff worked in a

boatyard for several years, cleaning and painting boats and servicing outboard motors (67-68).

---

[1] Numbers in parentheses denote pages in the Administrative Record.

In 1989, Plaintiff obtained her GED (652). At some point thereafter, she attended Nassau Community College, but only for a single year (651). In the mid 1990's, Plaintiff worked for Pearl Paint, an art supplies store, as a "working manager" in the "the clay department" (67, 70, 654). In that capacity, she stocked shelves, lifting clay and other supplies which frequently weighed about ten pounds and occasionally weighed as much as 50 pounds (70).

Plaintiff worked in that capacity for "about three years," until 1996 or 1997 (67, 70). At some point in the mid-1990's – variously described as around 1994 or 1995 or in 1997 (654-55) – Plaintiff's right knee "blew out" (654). Plaintiff had ambulatory, arthroscopic surgery on the knee but recovered slowly and continued to use a cane for the next nine or ten months (655).

In 1997, after a short period of unemployment, Plaintiff went to work for the Queens Surface Corporation, driving express buses between Queens and Manhattan (71, 656). As a bus driver, she sat throughout most of her eight-hour workday (71). After a year or two, Plaintiff began to experience back pain which, Plaintiff alleges, subsequently became so severe as to prevent her from working.

### *Plaintiff's Spinal Problems*

According to the Administrative Record, plaintiff began to experience persistent neck pain sometime in or before February 1998. On February 18, 1998, she had an MRI of her cervical spine, which indicated that she might have a "small right paracentral disc herniation" at C6-C7 (461). However, this could not be confirmed with certainty and the herniation, even if it existed, did not appear to "have significant compressive effect" (461).

On February 27, 1998, plaintiff was examined by Dr. Surendranath K. Reddy, an orthopedic surgeon. Plaintiff complained of moderately severe neck pain radiating into her right shoulder and arm and "significant pain" in the lower back, radiating into both legs (459). On

examination, Dr. Reddy found spasms and tenderness in the muscles in plaintiff's neck and lower back (459). Despite the uncertain MRI findings, Dr. Reddy diagnosed plaintiff as having cervical disc herniations, as well as traumatic paracervical and paralumbar myofascitis with radiculitis (460).[2] The doctor further opined that plaintiff was disabled at the time, and recommended a course of "intense physical therapy and rehabilitation" (460).

The Administrative Record does not contain records concerning plaintiff's treatment during the year and one-half following her visit to Dr. Reddy. However, the records reflect that plaintiff resumed her work as a bus driver sometime before December 13, 1999. On that date, plaintiff visited Main Street Med Care, P.C. ("Main Street"), reporting that her bus had been struck from behind and complaining of pain in her middle and lower back (491, 555). Following an examination which revealed tenderness in those regions, the examining physician – a General Practitioner named Christopher Garenani – theorized that plaintiff had "low back syndrome," lumbar radiculopathy and a post-traumatic thoracic sprain (497). Dr. Garenani prescribed Clinoril and Flexeril,[3] and told plaintiff to attend physical therapy three times a week (498).

A possible cause of plaintiff's pain became apparent in early February 2000, after plaintiff had an MRI of her lumbosacral spine. According to the radiologist's report, the MRI showed a "large posterior disc herniation at L5-S1 impinging on the anterior aspect of the spinal canal and nerve roots bilaterally" (539).

---

[2] Myofascitis is an inflammation of the thin layer of fibrous tissue (or fascia) that surrounds a muscle and attaches it to the bone. Http://www.biology-online.org/dictionary/Myofascitis.

[3] Clinoril is a brand name of Suldinac, a non-steroid, anti-inflammatory drug used for the management of mild to moderate pain. Http://www.medicinenet.com/sulindac/article.htm. Flexeril is a brand name of cyclobenzaprine, a muscle relaxant used to treat muscle spasms. Http://www.medicinenet.com/cyclobenzaprine/article.htm.

From February 2000 until at least January 11, 2001, plaintiff was treated by Dr. Alexandre B. de Moura, an orthopedic surgeon who was then affiliated with Main Street (418-23). When plaintiff first saw Dr. de Moura, she complained primarily of "buttock discomfort" (422). Dr. de Moura believed this discomfort was attributable to the disc herniation, and initially persuaded plaintiff to undergo a microlumbar discectomy (41-22).[4] However, plaintiff subsequently declined to have surgery, and was treated with a combination of anti-inflammatory medication, muscle relaxants and physical therapy (555).

By June 14, 2000, plaintiff was back to work and "doing rather well" (419). Although plaintiff reported at her June 28, 2000, visit that her back pain had "improved" and that she ceased to have "radicular symptoms" (419), plaintiff's condition deteriorated in the six months thereafter. By January 10, 2001, plaintiff was "having excessive back discomfort," but was "keeping her symptoms in check with continued physical therapy" and through constant use of anti-inflammatory medications (418).

On August 22, 2001, plaintiff re-injured her neck and lower back when the bus she was driving struck a bump (482, 555). She visited Dr. de Moura, who directed that she go to physical therapy three times a week for six weeks (473). On September 24, 2001, she returned to Main Street, where Dr. Garenani diagnosed her with a post-traumatic cervical sprain, lumbar radiculopathy and "low back syndrome" (497). To relieve her symptoms, plaintiff was taking not only Clinoril (Suldinac) and Flexeril, but Norco – a narcotic pain reliever (483).

Plaintiff had another MRI of her cervical spine on September 26, 2001. This time, the MRI showed not only that plaintiff had a right paracentral subligamentous disc herniation at C5-

---

[4]A microlumbar discectomy is a conservative microsurgical procedure for the treatment of a herniated lumbar disc. Http://www.ncbi.nlm.nih.gov/pubmed/663769.

6, but also that the discs at C3-4, C4-5, and C5-6 were all narrowed and mildly desiccated. The annulus fibrosus of all three of these intervertebral disc was bulging,[5] and there was a flattening of the normal curve of the cervical vertebrae, suggesting a cervical sprain or muscle spasm (470). According to Dr. Garenani's letter dated November 15, 2004, plaintiff also had another MRI of her lumbar spine on or about October 15, 2001. Although the Administrative Record does not contain a radiologist's report relating to this study, Dr. Garenani's letter states that the MRI found a "focal central L5/S1 herniated disc" similar in appearance to the herniation discovered during the February 1999 MRI (555).

Thereafter, plaintiff continued to be treated by Dr. Garenani. According to the doctor, plaintiff was "totally disabled" and unable to work between mid-September 2001 and February 6, 2002 (480). On February 24, 2002, Dr. Garenani wrote a letter on plaintiff's behalf, stating that plaintiff had herniated discs at C5-6 and L5-S1, as well as cervical and lumbar radiculopathy (481). Dr. Garenani further stated that plaintiff was being treated with "anti-inflammatory medication, muscle relaxants and physical therapy, without resolution of the pain" (481). The doctor opined that plaintiff was unable to continue driving a bus, but noted that she wanted to continue working for Queens Surface Corporation in a different capacity (481). Although Dr. Garenani stated that plaintiff was limited in her ability to stoop, bend, climb, kneel or crawl, and could not lift items weighing more than 40 pounds, he recommended that she be given a "trial transfer" to the maintenance shop (481).

However, plaintiff was still working as a bus driver in early March 2002, when she was examined by Dr. Michael J. Katz, an orthopedic surgeon employed as an independent medical

The annulus fibrosus is the thick, protective outer wall of the intervertebral disc structure. Http://www.herniated-disc-pain.org/annulus-fibrosus.html.

consultant by the Workers Compensation Board (499-502). Dr. Katz found a mild paravertebral spasm in plaintiff's lumbosacral region, and noted that plaintiff had multilevel disc bulges along her cervical spine and a herniated disc at L5-S1. Nonetheless, he diagnosed plaintiff as having a "[c]ervical strain, now resolved," and "lumbar derangement" which was "resolving" (501). Dr. Katz recommended that plaintiff continue to attend physical therapy twice a week, but only for another six weeks, stating, "I anticipate maximum medical improvement to be reached in six weeks" (502).

In fact, during most of the weeks in the month preceding plaintiff's visit to Dr. Katz, plaintiff had been attending physical therapy three – not two – times a week (208-224). Following the visit to Dr. Katz, she attended physical therapy only two days a week for two weeks (204-208), then resumed going three times a week almost every week for the next eight weeks (182-203). Thereafter, the frequency of plaintiff's visits to the physical therapist dropped precipitously. In June, July and September 2002, plaintiff went to the therapist only twice a month, and she went only once in August 2002 (174-181).

On October 18, 2002, plaintiff re-injured her neck when the bus she was driving struck a raised pavement on the Long Island Expressway (614). Dr. Garenani referred plaintiff to Dr. Rich Obedian, another orthopedic surgeon affiliated with Main Street. At her first appointment with Dr. Obedian, plaintiff complained of severe neck pain radiating down her left arm, telling the doctor that the pain could be as bad as 9 on a scale of 1 to 10 (479). On examination, Dr. Obedian determined that plaintiff had a left-sided trapezial spasm, and diagnosed plaintiff as having "cervical radiculopathy with cervical disc herniation" (479).

By the time of her next visit to Dr. Obedian – on December 18, 2002 – plaintiff developed severe lower back pain. Plaintiff described the pain as 10 on a scale of 1 to 10, and

stated that the pain radiated into her right leg (478). Dr. Obedian diagnosed plaintiff with cervical and lumbar radiculopathy and injected "the area of maximal tenderness" with a combination of Kenalog and Marcaine (478). These anesthetics initially provided "excellent pain relief," and Dr. Obedian referred plaintiff to a Dr. Stamatos for "possible epidural steroid injections" (478).

In January 2003, plaintiff began seeing a physiatrist, Dr. Richard McGraw, who was also affiliated with Main Street.[6] At her initial consultation with Dr. McGraw on January 15 or 16, 2003, plaintiff reported that the injection she had received from Dr. Obedian had provided relief for only one week (614). Dr. McGraw then performed an examination, in which he detected both paraspinal and trapezius muscle spasms and some decrease in plaintiff's range of motion. Dr. McGraw concurred with Dr. Obedian's diagnosis and recommendations (615).

By March 7, 2003, plaintiff's neck pain had "improved significantly" (477). However, further injections had yet to be authorized and plaintiff's regimen of physical therapy, anti-inflammatory medications and muscle relaxants had done nothing to alleviate her back pain, which "continue[d] to get worse" (477). On examination, Dr. Obedian determined that her condition was "essentially unchanged," and noted that she had not been able to return to work since the October 18, 2002, accident (478).

On March 14, 2003, Dr. McGraw performed an EMG and nerve conduction study of plaintiff's lumbar spine. These revealed "evidence suggestive of . . . chronic lower lumbosacral radiculopathy involving the L5 and S1 nerve roots" (533, 610). These results were consistent with the findings of Dr. McGraw's examination of plaintiff, which revealed, *inter alia,*

---

[6]A physiatrist is physician specializing in physical medicine and rehabilitation. Http://www.medterms.com/script/main/art.asp?articlekey=4890.

paraspinal tenderness from L4 to S1 bilaterally, decreased range of motion in the thoracolumbar spine, and a decreased sensation to pinpricks along the right L5-S1 distribution (613). On March 26, 2003, Dr. Obedian discussed Dr. McGraw's findings with plaintiff, opining that the EMG was "consistent with L5-S1 radiculopathy bilaterally" (476). His impression was that plaintiff had chronic lumbosacral radiculopathy and superimposed cervical radiculopathy (476).

On May 5, 2003, plaintiff was driving her car when she was sideswiped by a van (546). Although she injured her neck and left knee, she told Dr. Odebian on May 9, 2003, that most of her pain was in her lower back and right knee, and described the pain as varying from a 7 to a 9 on a scale of 1 to 10 (546). Plaintiff was taking several medications, including Norco and Lodine,[7] and reported obtaining some relief from these (546). After examination, Dr. Obedian opined that plaintiff had exacerbated the disc herniations in her cervical and lumbar spine, and had internal derangements in both knees (547). However, Dr. Obedian suspected that plaintiff might also have new disc herniations (547).

Dr. Obedian's suspicions were borne out by a series of MRIs conducted between June 9 and 18, 2003. An MRI of the cervical spine found a new disc herniation at C6-7, which was impinging on the anterior aspect of the spinal canal and the right nerve root (535). Plaintiff continued to have a disc herniation and C5-6, and disc bulges at C3-4 and C4-5, both of which were impinging on the anterior aspect of the spinal canal (535).

The MRI of plaintiff's lumbosacral spine revealed several new disc herniations. Plaintiff now had herniated discs at L3-4 and L4-5, as well as at L5-S1 (538). Moreover, while all three herniations were impinging on the anterior aspect of the spinal canal, the herniation at L3-4 was

---

[7]Lodine is another non-steroidal anti-inflammatory drug. Http://www.drugs.com/lodine.html.

impinging on the neural foramina, and the other herniations were impinging on the nerve roots bilaterally (538). Plaintiff also had MRIs of both knees, which revealed that plaintiff had sprained the medial collateral ligament in both knees, and found evidence consistent with a tear in the posterior horn of the medial meniscus in the left knee (537).

On June 18, 2003 – the very date on which plaintiff had the last of the MRIs – she also had the last of three lumbar epidural steroid injections administered by a Dr. Alexander E. Weingarten of Comprehensive Pain Management Associates (438). Those injections provided partial pain relief; at the time of the third injection, plaintiff told Dr. Weingarten that she was feeling "about 20% better" (438). However, plaintiff reported that these injections also gave her headaches (557). Accordingly, on July 15, 2003, Dr. Obedian decided to discontinue the injections and to rely on "non-operative [pain] management" techniques, including physical therapy and Darvocet (557).[8] Dr. Obedian thought plaintiff could benefit from back surgery, but plaintiff hoped to avoid it (475). Plaintiff was willing to schedule knee surgery on the left knee (557).

On August 22, 2003, plaintiff returned to Dr. Obedian's office to renew her prescription for physical therapy. Although she had intermittent cervical pain, her chief complaint was of lower back pain, radiating into both legs (474). Dr. Obedian observed that she was walking with an antalgic gait and, on examination, detected diffuse paralumbar spasms (474). Plaintiff again declined surgery, stating that her father had recently died and that she wanted to be available for her mother (474).

---

[8]Darvocet, a brand-name medication containing a combination of acetaminophen and propoxyphene, is a narcotic pain reliever which is used to treat mild to moderate pain. Http://www.drugs.com/darvocet.html.

On August 27, 2003, plaintiff underwent an independent medical examination with Dr. Leon Sultan, an orthopedist retained by the State of New York's Workers' Compensation Board. Dr. Sultan was provided with reports relating to the MRIs plaintiff had undergone prior to October 15, 2001, but not with reports relating plaintiff's June 2003 MRIs (447). After an examination in which he was unable to detect active spasms in either the paracervical or paralumbar muscles, Dr. Sultan diagnosed plaintiff as having "an ongoing mild partial lumbar spine disability," but found "no objective clinical signs of ongoing cervical spine disability" (447). Dr. Sultan concluded that plaintiff was "not fit for duty as a bus operator," but could perform "light and sedentary work" (447).

Over the course of 2003, there was a marked increase in the potency of the pain medication being prescribed to petitioner. In the beginning of 2003, Dr. Garenani was giving plaintiff prescriptions for 40 doses of Norco 5/325 – a narcotic painkiller consisting of 5 milligrams of hydrocodone bitartrate and 325 milligrams of acetaminophen – every two or three weeks (518-23). On or before July 15, 2003, Dr. Obedian began prescribing Darvocet – another narcotic pain reliever which contains propoxyphene napsylate rather than hydrochloride bitartrate and which is approved to treat mild to moderate pain. Http://pain.emedtv.com/ darvocet/darvocet-vs.-vicodin.html. In September 2003, Dr. Garenani began to prescribe Vicodin, a narcotic painkiller which is considered stronger than Darvocet and is approved to treat moderate to severe pain. *Id.* At first, Dr. Garenani prescribed Vicodin ES, which contains 7.5 milligrams of hydrocodone bitartrate and 750 milligrams of acetaminophen (513). However, by November 19, 2003, Dr. Garenani was prescribing Vicodin HP, which contains 10 milligrams

of hydrocodone bitartrate and 660 milligrams of acetaminophen. Http://www.drugs. com/forum/ pill-identification/vicodin-es-vicodin-hp-18160.html.[9]

### *Plaintiff's Application for Disability Insurance Benefits*

On January 26, 2004, plaintiff filed an application for Disability Insurance Benefits, alleging that she had been unable to work since October 18, 2002, because of herniated discs in her neck and lower back and injuries to her left knee (58). As part of her application, plaintiff completed a Disability Report in which she alleged, *inter alia*, that she could not "sit for long without being in severe pain" (58). That allegation was corroborated to some extent by observations recorded by an examiner who conducted a face-to-face interview with plaintiff on January 26, 2004. That examiner reported that, "[d]uring the interview [, plaintiff] had to stand frequently and complained of back pain" (55).

On February 18, 2004, plaintiff completed a questionnaire detailing the effect her disabilities had had on her activities of daily living. According to this questionnaire, plaintiff was subsisting largely on sandwiches, frozen dinners and other prepared foods because she could not stand long enough to prepare anything more substantial (75). While she could shop for small groceries and visit the pharmacy, she needed help to carry larger quantities of groceries or to do the laundry (76). Plaintiff could dust, "straighten up [her] house a little," and wash a few dishes, but claimed she would "always have pain after" doing these things (76). Plaintiff was unable to do "heavy cleaning," such as vacuuming and cleaning the bathroom (77). Plaintiff also stated that her pain limited her ability to use the computer, stating that it was "hard to sit for long" (77).

---

[9]Although Vicodin ES contains less acetaminophen than Vicodin HP, the latter contains more of the narcotic hydrocodone bitartrate, which is a more potent pain reliever than acetaminophen. Http://www.drugs. com/forum/pill-identification/vicodin-es-vicodin-hp-18160.html.

In addition, plaintiff stated that she could only walk two or three blocks before pain developed in her lower extremities, necessitating a rest of five or ten minutes before she could continue (79).

On March 12, 2004, plaintiff was examined by an orthopedist, Dr. Kyung Seo, who was retained by either the SSA or a related State agency to perform an independent medical examination. For reasons which are unclear, Dr. Seo received only an incomplete and somewhat misleading version of plaintiff's medical history. For example, Dr. Seo's one-and-one half-page report makes no mention of plaintiff's MRIs or of the multiple disc herniations that were apparent from those radiological studies. The report also makes no mention of painkillers or non-steroidal, anti-inflammatory drugs, but states that plaintiff was taking only cyclobenzaprine – the generic name for Flexeril, a muscle relaxant – at the time of the examination (548). Moreover, Dr. Seo's report states that, although plaintiff's activities of daily living were "somewhat limited," plaintiff was doing most of her own housework and shopping (548).

On examination, Dr. Seo found "mild spasms of the paraspinal muscles in plaintiff's neck and lower back" (548). Unaware of the radiological evidence of disc herniations, Dr. Seo speculated that these were attributable to "lower back derangement, probably degenerative disk disease" (549). Dr. Seo further speculated that plaintiff's knee pain was due to an "internal derangement of the left knee, probably [a] torn meniscus" (549). Dr. Seo opined that "due to the aching pain of the left knee and back with mild spasms, sitting is slightly limited, standing is slightly limited, and bending, lifting, and carrying heavy objects are slightly limited" (549).

In a letter dated April 21, 2004, the SSA informed plaintiff that her claim for DIB had been denied (27). Attached to this letter was a half-page "Explanation of Determination," dated April 16, 2004, which stated that a State agency, applying federal Social Security law and regulations, had concluded that plaintiff had the capacity to "perform light work" (30). The

Explanation of Determination expanded slightly on the meaning of the term, "light work," stating that plaintiff was considered capable of walking or standing for much of the working day, frequently lifting or carrying objects weighing up to ten pounds, and occasionally lifting objects weighing up to twenty pounds (30). However, neither the SSA's letter nor the Explanation of Determination made any mention of the fact that plaintiff had undergone a "shaving chondroplasty" of her left patella and medial femoral condyle on April 12, 2004 – arthroscopic surgery which determined that plaintiff's knee pain was due to chondromalacia rather than any damage to plaintiff's menisci (616-17).[10] Rather, the Explanation of Determination expressly stated that the State Agency had considered only Dr. Seo's report, a report relating to Dr. Garenani's initial December 13, 1999, examination of plaintiff and an October 30, 2003, report from plaintiff's physical therapist, which does not appear in the Administrative Record.

On or before June 3, 2004, plaintiff retained an attorney, Douglas C.J. Brigandi (31). On June 15, 2004, plaintiff requested a hearing before an Administrative Law Judge ("ALJ") (33). In connection with this request, plaintiff filed a form entitled, "Claimant's Statement when Request for Hearing is Filed and the Issue is Disability" – the first two pages of which appear in the Administrative Record (50). In those two pages, plaintiff disclosed that she had undergone knee surgery at North Shore University Hospital at Plainview on April 12, 2004, but stated that the pain in her knee had "gotten worse" following the surgery (50). Plaintiff also stated she

---

[10]Chondromalacia is defined as abnormal softening or degeneration of cartilage. Http://www.medterms.com/script/main/art.asp?articlekey=22765. In a "shaving chondroplasty," the roughened and degenerated articular cartilage tissue behind the patella is shaved down, re-contoured and evened out to the maximum extent possible or practical, using arthroscopic instruments. Http://www.kneeandshoulder.md/print/print_chondro.html.

could not sit longer than 15 to 20 minutes without pain, and could not clean or do "normal daily stuff" without "severe pain" (50).

Although plaintiff's statement expressly stated that she had seen both Dr. Garenani and Dr. Obedian sometime after April 21, 2004 (50-51), the Administrative Record does not contain any records from Dr. Garenani for the period between January 14 and August 11, 2004, and does not contain Dr. Garenani's charts for the period between September 15, 2004, and March 2, 2005.[11]  Similarly, the record contains only one document from Dr. Obedian for the period following plaintiff's knee surgery: an April 26, 2004, memorandum which states that plaintiff was "[d]oing well" following surgery (566).  However, that memorandum itself also states that plaintiff was expected to make a follow-up visit in a month (566).

Although Dr. Garenani's charts are only partly legible, it is clear that plaintiff continued to visit Dr. Garenani about once a month during the periods documented in the Administrative Record.  Furthermore, it is clear that plaintiff continued to complain of pain, and that Dr. Garenani continued to prescribe Vicodin HP in increasing quantities.  During the period between August 11, 2004, and February 9, 2005, Dr. Garenani was prescribing 60 doses of Vicodin HP about once every two months (591-94).  However, between February 9 and August 19, 2005, Dr. Garenani was writing prescriptions for 60 doses of Vicodin HP about once a month (580, 582, 585-89).  Thereafter, until at least the end of the year, Dr. Garenani was giving plaintiff prescriptions for 56 doses of Vicodin HP every two to three weeks (567-68, 570-73, 575, 578).

---

[11]While it is unclear whether plaintiff made visits to Dr. Garenani between January 14 and August 11, 2004, this Court notes that Dr. Garenani wrote prescriptions for plaintiff on November 10, 2004,and February 9, 2005 (591-92).  Accordingly, it seems likely that Dr. Garenani saw plaintiff on those dates.

The day before plaintiff's January 12, 2006, hearing, Dr. Garenani completed a two-page form entitled, "Medical Assessment of Ability to Do Work-Related Activities" (623-24). In that form, Dr. Garenani opined that plaintiff (1) could lift and carry objects weighing five pounds or less on a frequent basis, but could not lift objects weighing more than eight pounds; (2) could stand without interruption for only 15 to 20 minutes at a time, and could stand for a total of only three hours over the course of an eight-hour day; (3) could walk only one block at a time; (4) could sit without interruption for only 10 to 15 minutes at a time, and could sit for a total of only two hours over the course of an eight-hour day; and (5) was "unable to push/pull in any capacity" (623-24). Writing in his usual, tiny, barely legible script, Dr. Garenani also listed the "medical findings" which supported these opinions, noting, *inter alia*, that plaintiff had "lumbar herniated discs [at L3-4, L4-5 and L5-S1] with impingement," "cervical herniated discs [at C5-6 and C6-7] and impinge[ment]," cervical and lumbar radiculopathy and cervical and lumbar spasms (623).

On January 12, 2006, plaintiff received a hearing before ALJ Marilyn Hoppenfeld. In describing her limitations, plaintiff gave testimony which was largely consistent with the opinions expressed by Dr. Garenani. Plaintiff testified that she (1) might be able to lift objects weighing five or six pounds, but could not lift objects weighing ten pounds (678); (2) could stand "maybe 15, 20 minutes" at a time (677); (3) could walk "maybe about a block [or] . . . a block and a half" before the pain would prevent her from going further (676); and (4) could only sit for "maybe ten, 15 minutes before . . . hav[ing] . . . to change positions or stand up or lay down" (677-78). Indeed, about halfway through the hearing, plaintiff requested permission to stand up (664).

15

Plaintiff also testified to limitations in her activities of daily living, which were largely consistent with what she had written in the statement she filed in connection with her request for a hearing. *See* 11-12, *ante*. Plaintiff stated that she could shop for small items, such as bread and milk, and could make coffee and toast for breakfast (680). However, the rest of the plaintiff's shopping and cooking, as well as her cleaning and laundry, was done by a roommate who performed these tasks in exchange for free rent (680). Plaintiff testified that she could not perform even sedentary work because she was "in so much pain" (690) – an estimated 8 or 9 on a scale of 1 to 10 (692). According to plaintiff, this pain forced her to lie down two or three times a day for period ranging between an hour to an hour and one-half (692-93).

Near the close of the hearing, ALJ Hoppenfeld stated:

> [S]he can't do her past work. There's no question about it. Now I just have to find, have enough to reduce it to less than sedentary (689).

Plaintiff's attorney immediately referred the ALJ to Dr. Garenani's January 11, 2006, medical assessment, but the ALJ implied that this assessment was insufficient, saying, "But that's the internist" (689). The ALJ did not request that plaintiff obtain assessments from either Dr. Obedian or Dr. McGraw, but decided to refer plaintiff to a neurologist for an independent medical examination (690). By way of explanation, ALJ Hoppenfeld stated:

> [L]et him see what he finds in the objective neurological situation because we have to have deficits. . . . You need deficits. Deficits means he has to find loss of sensation, loss of motor, the talgic [phonetic] gait.[12] Let the neurologist find all those things in a report, and then we have less than sedentary (690).

---

[12]Presumably, the ALJ was referring to an "antalgic gait": a limp in which a phase of the gait is shortened on the injured side to alleviate the pain experienced when bearing weight on that side. *See* American Heritage Medical Dictionary (Houghton Mifflin Co. 2007).

On February 7, 2006, plaintiff received a neurologic examination from Dr. Kautilya Puri, an independent medical examiner whose qualifications are unclear from the Administrative Record (705). Dr. Puri was at least aware of the results of plaintiff's 2003 EMG and MRIs (705), though it is unclear how much information the doctor had with respect to each test. On examination, Dr. Puri found a decreased range of motion in plaintiff's lumbar spine, and "mild tenderness in the cervical area and the lumbosacral area" (707). However, the doctor was unable to detect any muscle spasms, and observed that plaintiff had a normal gait and normal sensations to pain (707). Dr. Puri did not perform any electrodiagnostic tests, but diagnosed plaintiff as having low back pain, cervical neck pain, and radiculopathy (707).

On February 29, 2006 – approximately three weeks after Dr. Puri's examination, someone listing their medical specialty as "neurology" completed a form entitled, "Medical Source Statement of Ability to Do Work-related Activities (Physical)" (709-12). The person who completed this form opined that plaintiff could both sit and stand for about six hours during an eight-hour workday; could lift 25 pounds frequently and 20 pounds occasionally; and could climb, kneel, crouch, crawl and stoop occasionally (709-10). The person further opined that plaintiff could not perform acts which required balancing and was limited in her ability to push and pull, but was not specific with respect to the nature and degree of this limitation (710).

Although the signature on this form can arguably be read as "Kautilya Puri," the signature is entirely different from the signature that appears on Dr. Puri's report on the February 7, 2006, examination. Plaintiff's counsel noted this anomaly in a letter to ALJ Hoppenfeld dated August 30, 2006, and demanded the opportunity to cross-examine Dr. Puri as to whether she had examined plaintiff or authored the form (715-16). In addition, plaintiff's counsel asked the ALJ to consider two additional documents. The first was a letter, dated March 14, 2006, in which Dr.

17

Garenani opined that plaintiff had chronic back pain and bilateral knee pain (703). In that letter, Dr. Garenani recounted plaintiff's medical history, including the results of plaintiff's many MRIs, and the 2003 EMG, and opined that plaintiff met three of the listings set forth in the SSA's Listing of Impairments, including 104(A) (702-04). The second was a radiological report relating to an April 19, 2006, MRI of plaintiff's left knee, which indicated that plaintiff not only had chondromalacia patella – damage to the cartilage under her kneecap, *see* http://www.mayoclinic.com/health/chondromalacia-patella/ds00777 – but also had a "large area of missing cartilage involving the weight-bearing surface of the medial femoral condyle" (714).

The Administrative Record does not indicate whether ALJ Hoppenfeld ever responded to plaintiff's counsel's letter, or made any effort to determine who had completed the form dated February 29, 2006. However, on November 15, 2006, ALJ Hoppenfeld issued a 13-page decision in which she relied in part on the assessment set forth in the form dated February 29, 2006, in finding that plaintiff was not disabled.

### *The Legal Standard for Disability Determination*

To facilitate the discussion of the ALJ's decision, it is necessary to briefly discuss the law relating to plaintiff's application for DIB. Under 42 U.S.C. §423(a)(1), any person who has not yet attained retirement age and who files the requisite application is entitled to DIB if he or she is insured for disability insurance benefits, as determined under 42 U.S.C. §423(c)(1), and is "disabled." The term "disabled" is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). However, the statute itself provides that for purposes of §423(d)(1)(A):

(A) An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work . . . [and]

(B) In determining whether an individual's physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under this section, the Commissioner of Social Security shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity. If the Commissioner of Social Security does find a medically severe combination of impairments, the combined impact of the impairments shall be considered throughout the disability determination process.

42 U.S.C. §423(d)(2).

The Social Security Regulations require that, in deciding whether a claimant is disabled, SSA personnel use the "five-step sequential evaluation process" delineated in 20 C.F.R. §404.1520(a). Under this five-step framework, the SSA must first consider the claimant's work activity. If the claimant is currently engaged in "substantial gainful employment," the claimant is not disabled, regardless of the medical findings. 20 C.F.R. §§404.1520(a)(4)(i), 404.1520(b). Otherwise, the SSA next considers the "medical severity" of the claimant's impairment. 20 C.F.R. §404.1520(a)(4)(ii). If the claimant does not have "any impairment or combination of impairments which significantly limit [his or her] physical or mental ability to do basic work activities," the claimant does not have a severe impairment and, therefore, is not disabled. 20 C.F.R. §404.1520(c).

In the third step, the SSA further considers the medical severity of the impairment by comparing the claimant's impairments to those impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant has an impairment which meets the duration requirement and is listed in Appendix 1 or is equal to a listed impairment, the claimant is disabled. 20 C.F.R. §404.1520(d). If not, the SSA must proceed to the fourth step and assess the claimant's "residual functional capacity" to do his or her "past relevant work." 20 C.F.R. §404.1520(a)(4)(iv). If the claimant can still do his or her "past relevant work," the claimant is not disabled. *Id.* However, even if the claimant can no longer perform the past relevant work, the claimant is not disabled if he or she "can make an adjustment to other work." 20 C.F.R. §404.1520(a)(4)(v). The Social Security Administration bears the burden of proof only with respect to this fifth step. The claimant bears the burden with respect to the other four steps. *Green-Younger v. Barnhart,* 335 F.3d 99, 106 (2d Cir. 2003).

### The ALJ's Decision

In this case, there was no question that plaintiff had filed the requisite application and had not attained retirement age. Accordingly, after determining that plaintiff was insured under the SSA through the end of 2007 (17), ALJ Hoppenfeld engaged in the five-step analysis dictated by 20 C.F.R. §404.1520(a) in order to determine whether plaintiff was disabled.

First, the ALJ determined that plaintiff had not engaged in substantial gainful employment since October 18, 2002, the alleged onset date (17). Second, the ALJ determined that plaintiff had several impairments – which she characterized as "low back pain, cervical neck pain and bilateral knee sprain" and found that "[t]hese impairments could be severe, if it is established that they cause significant vocational limitations" (17). Third, the ALJ found that

plaintiff did not "have an impairment or combination of impairments that meets or medically equals one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1.

In step four of the five-part analysis, the ALJ found that plaintiff had "the residual functional capacity to perform at least a full range of sedentary work activity if not light work" (17). At first, the ALJ opined that plaintiff was "able to sit for 6 hours per 8 hour workday, with normal breaks, able to stand/walk for at least 2-6 hours during an 8 hour workday and can lift and carry 10-20 pounds occasionally" (17). Later in her decision, the ALJ slightly changed that assessment by finding that plaintiff could "lift and carry 10 pounds occasionally and up to 10 pounds frequently" (24). The ALJ implicitly recognized that both of these assessments differed from Dr. Puri's, noting, "it has been opined she could carry up to 25 pounds and stand for six hours" (24). However, the ALJ apparently saw fit to change that assessment in light of the April 2006 MRI of plaintiff's left knee, and found that plaintiff had been "reduced to sedentary work activity" (24).

In the course of determining plaintiff's residual functional capacity, the ALJ considered plaintiff's claims of pain. The ALJ found that plaintiff had "presented medical evidence showing that she has an impairment which reasonably could be expected to produce some pain, if it is established that there is nerve root involvement for the neck and back" (22). However, while acknowledging that plaintiff had "some central and posterior herniations," the ALJ found no medical evidence of "any involvement of the existing nerve roots" and "no objective findings of motor, sensory or significant neurological deficits" in the record (22). The ALJ failed to mention that portion of Dr. Garenani's March 14, 2006, letter which stated that plaintiff had "chronic, persistent, and disabling loss of motion function, sensory nerve impingement and thus, symptomology" and that there were "numerous positive objective tests to support these clinical

21

symptoms and findings" (704). Rather, the ALJ stated that Dr. Garenani "offered no significant neurological deficits to establish any existing nerve root involvement" (23) and found that "the opinion of the treating doctors was based upon [plaintiff's] subjective complaints" (22).

Despite finding inadequate objective medical evidence of nerve root involvement, the ALJ conceded that plaintiff might experience mild to moderate pain "with some activities" (22). However, the ALJ found that "[n]either the objective medical evidence nor the testimony of the [plaintiff] establishes that the ability to function has been so severely impaired as to preclude all types of work activities" (22). In support of this proposition, the ALJ stated:

> Her activities are consistent with light work. She is able to drive; she walks her pets when she can; she is able to prepare sandwiches and quick items in the microwave, she pays her bills, handles a check book [*sic*]/money orders and a savings account and drives to Yonkers to visit her brother. She stated that she watches TV and spends time on her computer.
>
>           \*        \*        \*
>
> Also while some copies of prescriptions medications were supplied, there is no evidence that [plaintiff] has been under continuous pain medication. No pharmacy print out has been supplied and it is not clear . . . whether [plaintiff] was under continuous pain medications or muscle relaxers (22-23).

Although the ALJ concluded that plaintiff was capable of sedentary work, she found that plaintiff was unable to perform any past relevant work. However, applying the Medical-Vocational Guidelines set forth in 20 C.F.R. Part 404, Subpart P, Appendix 2, the ALJ concluded that, given plaintiff's age, education, and previous work experience, plaintiff was "not disabled" under Rule 201.27 of those Guidelines (24). Accordingly, the ALJ concluded that plaintiff was not disabled under Sections 216(i) and 223(d) of the Social Security Act (25).

Plaintiff promptly requested that the Appeals Council review the ALJ's decision (10). On June 12, 2007, the Appeals Council denied this request, making ALJ Hoppenfeld's

November 15, 2006, decision the final decision of the Commissioner in plaintiff's case (3-5).

Less than one month later, on July 9, 2007, plaintiff commenced this action, alleging that the

ALJ's decision "contains flagrant error, distorts the medical record, and fails to follow the

treating physicians rule as required by the Second Circuit . . . ." Complaint at ¶ 14.

The parties now cross-move for judgment on the pleadings pursuant to Rule 12(c) of the

Federal Rules of Civil Procedure. To the extent that they are relevant to the resolution of this

matter, the parties arguments are summarized in the discussion below.

*DISCUSSION*

## I. Scope of Review

"The scope of review of a disability determination under 42 U.S.C. § 423(a)(1) . . .

involves two levels of inquiry." *Johnson v. Bowen*, 817 F.2d 983, 983 (2d Cir. 1987) (citing

cases). First, a court must decide whether the Commissioner "applied the correct legal principles

in making the determination." *Id.* Second, a court must decide "whether the determination is

supported by 'substantial evidence.'" *Id.* (citing 42 U.S.C. § 405(g) (1982)).

### A. Legal Principles

As this Court noted previously, the determination of whether plaintiff was entitled to DIB

in this case turns on the question of whether or not she was disabled. *See* pp. 20, *ante*. In

deciding whether plaintiff was disabled, the Commissioner is required by the Social Security

regulations to use the five-step process set forth in 20 C.F.R. §404.1520(a). *See* pp. 19-20, *ante*.

However, the Social Security regulations also dictate what evidence the Commissioner must

consider, and the manner in which the Commissioner must evaluate the evidence.

First, the regulations require that, under some circumstances, deference be given to the

opinions of those physicians who have personally treated social security claimants. The

23

"treating physician rule" provides that a treating source's opinion regarding the nature and severity of a claimant's impairments that is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and not inconsistent with the other substantial evidence in the record should be given controlling weight. 20 C.F.R. § 404.1527(d)(2). However, the "opinions of a treating physician . . . need not be given controlling weight where they are contradicted by other substantial evidence in the record." *Veino*, 312 F.3d at 588 (citations omitted). The less consistent an opinion is with the record as a whole, the less weight it will be given. *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999).

An ALJ is "free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions." *McBrayer v. Sec'y of Health & Human Servs.*, 712 F.2d 795, 799 (2d Cir. 1983) (quoting *Gober v. Matthews*, 574 F.2d 772, 777 (3d Cir.1978)). Yet, an ALJ is not "permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion." *Burgess v. Astrue*, 537 F.3d 117, 131 (2d Cir. 2008) (*Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000)). For that matter, an ALJ cannot set his own expertise against that of any physician who submitted an opinion to or testified before him or her. *See Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir.1998).

If an ALJ decides not to give controlling weight to a treating physician's opinion, the ALJ must "give good reasons" for doing so. 20 C.F.R. §404.1527(d)(2). In determining what weight to give to the treating physician's opinion, the ALJ is required to apply the following factors: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating source's opinion is with the record as a whole; (5) the specialization of the source in contrast to the condition being treated; and (6) any other

significant factors. *See id.* After considering the above factors, the ALJ must "comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion." *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004).

Before an ALJ can weigh these factors, however, the ALJ must develop the record. *Burgess v. Astrue*, 537 F.3d at 129 (2d Cir. 2008). Indeed, an "ALJ has an obligation to develop the record in light of the non-adversarial nature of the benefits proceedings, regardless of whether the claimant is represented by counsel." *Shaw*, 221 F.3d at 131. "In light of the ALJ's affirmative duty to develop the administrative record, 'an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record.'" *Burgess*, 537 F.3d at 129 (quoting *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999)). "[W]here . . . an ALJ concludes that the opinions or reports rendered by a claimant's treating physicians lack objective clinical findings, she may not reject the opinion as unsupported by objective medical evidence without taking affirmative steps to develop the record in this regard." *Rivas v. Barnhart*, No. 01 Civ. 3672 (RWS), 2005 WL 183139, at *23 (S.D.N.Y. Jan. 27, 2005).

In determining the claimant's residual functional capacity, an ALJ is required to take into account a claimant's assertions of pain and other limitations. *See Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). The SSA regulations establish the following two-step process for evaluating these assertions:

> At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. 20 C.F.R. §404.1529(b). That requirement stems from the fact that subjective assertions of pain *alone* cannot ground a finding of disability. 20 C.F.R. § 404.1529(a). If the claimant does suffer from such an impairment, at the second step, the ALJ must consider "the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical

25

evidence and other evidence" of record. *Id.* The ALJ must consider "[s]tatements [the claimant] or others make about [his] impairment(s), [his] restrictions, [his] daily activities, [his] efforts to work, or any other relevant statements [he] make[s] to medical sources during the course of examination or treatment, or to [the agency] during interviews, on applications, in letters, and in testimony in [its] administrative proceedings." 20 C.F.R. §404.1512(b)(3); *see also* 20 C.F.R. § 404.1529(a); S.S.R. 96-7p.

*Id.* (emphasis in original).

"It is well settled that 'a claimant's subjective evidence of pain is entitled to great weight' where . . . it is supported by objective medical evidence." *Simmons v. U.S. R.R. Ret. Bd.*, 982 F.2d 49, 56 (2d Cir. 1992) (citations omitted). Where an ALJ rejects subjective testimony concerning pain, the ALJ "must do so explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his determination is supported by substantial evidence." *Brandon v. Bowen*, 666 F.Supp. 604, 608 (S.D.N.Y. 1987). "Since symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone," the ALJ must consider *inter alia*: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the pain or symptoms; (3) any precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side-effects of medication taken to alleviate the pain or other symptoms; (5) any treatments, other than medication, for relief of pain or other symptoms; and (6) any other measures used to relieve pain or other symptoms. 20 C.F.R. § 404.1529(c)(3).

**B.  *Substantial Evidence***

If the Commissioner applied the correct legal principles, a court reviewing a disability determination under 42 U.S.C. § 423(a)(1) must decide whether the Commissioner's determination was supported by "substantial evidence." *Johnson*, 817 F.2d at 985. This action

26

is brought pursuant to 42 U.S.C. § 1383(c)(3), which provides that the final determination of the Commissioner of Social Security after a hearing to determine eligibility for benefits is subject to judicial review as provided in 42 U.S.C. § 405(g). Section 405(g) permits "[a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, . . . [to] obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision . . . in the district court of the United States for the judicial district in which the plaintiff resides . . . ." Upon this review, this district court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

Section 405(g) expressly provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." Thus, if the Commissioner's decision is supported by "substantial evidence" and there are no other legal or procedural deficiencies, then the decision must be affirmed. *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) ("In reviewing the final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision.") "Substantial evidence" connotes "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389 (1971); *see also Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002).

"In determining whether substantial evidence supports a finding of the Secretary, the court must not look at the supporting evidence in isolation, but must view it in light of other evidence in the record that might detract from such a finding, including any contradictory

evidence and evidence from which conflicting inferences may be drawn." *Rivera v. Sullivan*, 771 F. Supp. 1339, 1351 (S.D.N.Y. 1991); *see also Veino*, 312 F.3d at 586 ("The district court's review of the Commissioner's decision regarding [the existence of a] disability is limited to a determination of whether the decision is supported by 'substantial evidence' in the record as a whole."). The "substantial evidence" test applies only to the Commissioner's factual determinations; similar deference is not accorded to the Commissioner's legal conclusions or to the agency's compliance with applicable procedures mandated by statute or regulation. *See Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) ("This deferential ["substantial evidence"] standard of review is inapplicable . . . to the Secretary's conclusions of law" and "[f]ailure to apply the correct legal standards is grounds for reversal.").

### III. Plaintiff's Arguments

In moving for judgment on the pleadings in this case, plaintiff argues that the ALJ made both procedural and factual errors in applying the five-step evaluation process. First, plaintiff argues that the ALJ's findings in step two regarding the nature of plaintiff's impairments were "grossly inadequate." Plaintiff's Memorandum of Fact and Law in Opposition to Defendant's Motion and in Support of Plaintiff's Cross-motion for Judgment on the Pleadings ("Plaintiff's Memo") at 5. Second, plaintiff implies that the ALJ did not properly apply the "treating physician rule," stating that the treating physician's opinion "should be dispositive of the matter . . . and should result in outright reversal." *Id.* Third, plaintiff argues that the ALJ did not consider whether plaintiff was capable of sedentary work on "a regular and continuing basis," and implies that the ALJ's finding at step four was not supported by substantial evidence.

### A. *Plaintiff's Impairments*

With respect to plaintiff's first argument, this Court agrees that the ALJ trivialized plaintiff's impairments by characterizing them as "low back pain, cervical neck pain and bilateral knee sprain." First, although Dr. Puri may have diagnosed plaintiff with "low back pain" and "cervical neck pain" (707), Dr. Puri's own report recounted the radiological evidence of disc herniations and bulges in plaintiff's cervical and lumbar spine (705). Moreover, as Dr. Puri's report indicated, many of these herniations and bulges were impinging on portions of the spinal canal and nerve roots. For example, the June 2003 MRI of plaintiff's cervical spine established that plaintiff had a herniation at C6-7, which was impinging on the anterior aspect of the spinal canal and the right nerve root (535), and disc bulges at C3-4 and C4-5, both of which were impinging on the anterior aspect of the spinal canal (535). Similarly, the June 2003 MRI of plaintiff's lumbosacral spine revealed that plaintiff had herniated discs at L3-4, L4-5, and L5-S1; that the first of these was impinging on the neural foramina; and that the other two herniations were impinging on the nerve roots bilaterally (538). In light of these objective medical findings, it might have been more accurate to characterize the first two impairments as herniated nucleus pulposus of the cervical and lumbar spine.

Second, plaintiff's left knee impairment cannot be fairly characterized as a mere sprain. While the injury to plaintiff's left knee might have initially been diagnosed as a sprain, Dr. Obedian ascertained during surgery in April 2004 that plaintiff had chondromalacia patella – damage to the cartilage under her left kneecap (616). This condition necessitated a "shaving chondroplasty of the patella and medial femoral condyle" (616), presumably resulting in the "large area of missing cartilage involving the weight-bearing surface of the medial femoral condyle" that was observed in the April 16, 2006, MRI of plaintiff's left knee (714). Although

that same MRI confirmed that plaintiff continued to have chondromalacia patella, this condition was not listed as one of plaintiff's impairments.

Under 42 U.S.C. §423(d)(1)(A) the Commissioner is required to "consider the combined effect of all of [a claimant's] impairments" in determining their severity. Furthermore, if the Commissioner finds a "medically severe combination of impairments," the Commissioner is required to consider "the combined impact of the impairments throughout the disability determination process." *Id.* Since an ALJ's failure to appreciate the true nature of a claimant's impairments might contaminate the findings at later stages of the five-step analysis, such a failure might, under some circumstances, require remand.

In this case, however, the ALJ's decision suggests that she was fully aware of the nature of plaintiff's impairments. Her decision contains a thorough description of each of the MRIs mentioned above. In addition, her decision to reject that portion of Dr. Puri's report which opined that plaintiff could carry up to 25 pounds and stand for up to six hours during an eight-hour workday was based on the results of the April 19, 2006, MRI of plaintiff's left knee (24). Accordingly, even though the ALJ listing of plaintiff's impairments may have been inaccurate, this Court is satisfied that the ALJ considered the combined effect and impact of plaintiff's herniated discs and chondromalacia patella at all relevant points throughout the disability determination process. *See Stanton v. Astrue,* No. 09-4088-cv, 2010 WL 1076121, at *1 n.1 (2d Cir. March 24, 2010) (summary order) (the ALJ's failure to explicitly list plaintiff's disc herniations as an impairment in step two would not warrant remand because the ALJ's decision made clear that he considered the "combination of impairments" and the combined effect of "all symptoms").

## B. The "Treating Physician Rule"

With respect to plaintiff's second argument, this Court agrees with plaintiff that the ALJ failed to properly apply the "treating physician rule." The ALJ's decision implies that Dr. Garenani's opinion was not well-supported by medically acceptable clinical and laboratory diagnostic techniques, stating that "[t]he opinion of the treating doctors was based upon plaintiff's subjective complaints" (22). However, Dr. Garenani's letter dated March 14, 2006, in which he opined that plaintiff had chronic back pain and bilateral knee pain, discusses the many objective tests on which his opinion was based (702-03). Among these tests were several MRIs and a 2003 EMG which found "evidence suggestive of a chronic lower lumbosacral radiculopathy involving the L5 and S1 nerve roots" (533). While the ALJ may have been correct in finding that this neurological evidence was insufficient to support Dr. Garenani's conclusion that plaintiff's combination of impairments was equal to the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, it was inaccurate to state that Dr. Garenani's opinion was based solely on plaintiff's subjective complaints.

Even assuming there was a lack of objective medical evidence in the record supporting Dr. Garenani's opinion, the ALJ could not have rejected the treating physician's opinion without making an effort to fill clear gaps in the administrative record. *See Burgess*, 537 F.3d at 129; *Rosa*, 168 F.3d at 79. Although Dr. Garenani's records and pharmacy scripts indicate that plaintiff visited Dr. Garenani at least once a month in 2003 and 2005, the Administrative Record does not contain any records from Dr. Garenani for the seven-month period between January 14 and August 11, 2004. Moreover, the record does not contain Dr. Garenani's chart for November 10, 2004, or February 9, 2005, even though the record indicates that Dr. Garenani wrote prescriptions for plaintiff on those days. Given these obvious gaps in the record, the ALJ could

not have properly reject Dr. Garenani's opinions as unsupported by objective clinical findings without taking affirmative steps to find the missing documents. *See Rivas*, 2005 WL 183139, at *23.

To the extent that there was substantial evidence in the record contradicting Dr. Garenani's opinion, ALJ Hoppenfeld was not required to give Dr. Garenani's opinion controlling weight. *See Veino*, 312 F.3d at 588. However, the ALJ was nonetheless required to consider the factors listed in 20 C.F.R. § 404.1527(d)(2), including (1) the fact that Dr. Garenani had been treating plaintiff on a regular basis for over six years at the time he wrote his March 14, 2006, letter; (2) that he was her primary care physician; (3) that at least some aspects of his opinion were supported by considerable objective medical evidence; (4) that this medical evidence was largely consistent with Dr. Garenani's opinion; and (5) the fact that Dr. Garenani, while only an internist, had been working closely with specialists employed by his office in coordinating plaintiff's care. Moreover, after considering these factors, the ALJ should have comprehensively set forth her reasons assigning little or no weight to Dr. Garenani's opinions. *See Halloran*, 362 F.3d at 33.

In this case, the ALJ not only failed to give good reasons for disregarding Dr. Garenani's opinion, but arbitrarily substituted her views for those of the medical professionals who had examined plaintiff. Dr. Garenani opined that plaintiff could walk without pain for only one block, could stand for only 15 to 20 minutes at a time, could stand and/or walk for only three hours in an eight-hour workday, could lift five pound frequently and could lift up to eight pounds occasionally (623). In contrast, the Medical Source Statement dated February 29, 2006, stated that plaintiff could stand and/or walk for about six hours in an eight-hour workday, could lift up to 20 pounds frequently and could lift up to 25 pounds occasionally (709). Assuming that she

could establish that the Medical Source Statement was completed by Dr. Puri, the ALJ was free to choose between these medical opinions. *See McBrayer*, 712 F.2d at 799; *Gober*, 574 F.2d at 777. Instead, the ALJ chose to rely on her own expertise, concluding that plaintiff was "able to stand/walk for at least 2 hours during an 8 hour workday and . . . lift and carry 10 pounds occasionally and up to 10 pounds frequently" (24).

ALJ Hoppenfeld not only disregarded the doctor's medical opinions, but disregarded portions of the record and plaintiff's testimony in evaluating plaintiff's claims of pain. In discussing plaintiff's daily activities, the ALJ selectively mentioned only the evidence supporting her contention that plaintiff's "activities [were] consistent with light work," while ignoring all evidence to the contrary. For example, the ALJ noted that plaintiff was "able to prepare sandwiches and quick items in the microwave" (22), but ignored evidence that she could not stand long enough to prepare anything more substantial (75, 680). Similarly, the ALJ noted that plaintiff "spends time on her computer" (23), but ignored plaintiff's statements that her time on the computer was limited by her inability "to sit for long" (77).

There is no indication that the ALJ made any serious attempts to evaluate other relevant factors, such as (1) the location, duration, frequency, and intensity of the pain or symptoms; (2) any precipitating and aggravating factors; (3) the type, dosage, effectiveness, and side-effects of medication taken to alleviate the pain or other symptoms; (4) any treatments, other than medication, for relief of pain or other symptoms; and (5) any other measures used to relieve pain or other symptoms. *See* 20 C.F.R. § 404.1529(c)(3). For example, the ALJ made no mention of plaintiff's hearing testimony that her "pain level on a daily basis" was 8 or 9 on a scale of 1 to 10 (692), and that she had to lie down two or three times a day, for an hour to an hour and one-half each time (693). The ALJ also made no mention of the unsuccessful attempts by Dr. Weingarten

33

of Comprehensive Pain Management Associates to treat plaintiff's pain through series of epidural injections in 2003 (438).

Although the ALJ acknowledged that "some copies of prescription medications were supplied" (23), she apparently failed to note that throughout 2005 – the last year for which the ALJ had records – Dr. Garenani was prescribing increasingly potent pain relievers. While it may be true that there is no evidence that plaintiff was "under continuous pain medication" (23), this Court notes that from August 19, 2005, until at least the end of the year, Dr. Garenani was giving plaintiff prescriptions for 56 doses of Vicodin HP every two to three weeks (567-68, 570-73, 575, 578). Assuming that plaintiff was actually taking this number of pills, plaintiff may have been taking as many as four doses every day. To be sure, the record contains no proof that these prescriptions were actually filled. However, if the ALJ harbored any suspicions that the penurious plaintiff was not filling the prescription she worked so hard to procure, the ALJ should have developed the record regarding plaintiff's use of the painkillers herself, rather than simply noting that "[no pharmacy print out [*sic*] has been supplied" (23).

### C. *Plaintiff's Ability to Do Sedentary Work on a Regular and Continuing Basis*

Because remand is necessary for the reasons stated in the preceding section, this Court need not address plaintiff's third argument at any length. However, this Court agrees with plaintiff's argument to the extent that it focuses the inquiry on plaintiff's endurance. Plaintiff is not claiming that she is unable to sit, walk or stand normally for a short period of time. Rather, she is claiming that pain prevents her from sitting, walking or standing very long. Accordingly, Dr. Puri's observations concerning plaintiff's gait, range of motion and ability to perform certain tasks or maneuvers during a relatively short examination may not be particularly helpful in determining whether or not plaintiff is disabled.

## CONCLUSION

For the reasons set forth above, this Court denies the Commissioner's motion for

judgment on the pleadings, and grants plaintiff's cross-motion to the extent of remanding this

action to the Commissioner for further proceedings in accordance this opinion.

**SO ORDERED.**

s/ SLT

SANDRA L. TOWNES
United States District Judge

Dated: July    8   , 2010
        Brooklyn, New York